IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-00190-01-CR-W-BP |
| | ) | |
| DAVID R. PENTON, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Penton's Motion to Suppress Evidence (doc #33). For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On June 2, 2015, a criminal complaint was filed against defendant David R. Penton. On June 10, 2015, the grand jury returned a one-count indictment against defendant Penton. The indictment charges that on June 1, 2015, defendant knowingly possessed with intent to distribute Oxycodone.

On July 13, 2016, the undersigned conducted an evidentiary hearing on the motion to suppress. Defendant Penton was represented by Assistant Federal Public Defender Carie Allen. The Government was represented by Assistant United States Attorney Joseph Marquez. The Government called Detective Antonio Garcia of the Kansas City, Missouri Police Department and Special Agent Doug Dorley of the United States Drug Enforcement Administration as witnesses. Defendant Penton testified on behalf of the defense.

## II. FACTS

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On June 1, 2015, at approximately 9:40 a.m., Detective Antonio Garcia of the Kansas City, Missouri Police Department, who was assigned to Drug Enforcement in the Interdiction Squad, was on duty at the Greyhound Bus Station at 1101 Troost in Kansas City, Missouri. (Tr. at 4-5)  Detective Garcia is assigned as a K-9 handler for the Interdiction Squad. (Tr. at 4)  A bus which had originated out of Los Angeles, California, arrived at the station. (Tr. at 5)  Los Angeles, California, is considered a source city for narcotics. (Tr. at 5)  Detective Garcia responded with his dog to conduct a sniff check of the luggage in the bottom of the bus. (Tr. at 5)  The dog did not alert to anything. (Tr. at 6)  Detective Garcia then stood by the bus and watched passengers exit the bus. (Tr. at 6)  Detective Garcia was watching the passengers to see their reaction to the dog. (Tr. at 6)

2. Detective Garcia observed defendant Penton exit the bus carrying a black backpack. (Tr. at 6-7)  Penton looked around prior to walking into the bus station. (Tr. at 7)  Detective Garcia testified that Penton's actions seemed suspicious because Penton appeared to be looking around to see if anybody was looking at him. (Tr. at 7)  Detective Garcia secured his dog and went into the bus station to look for Penton. (Tr. at 7)  Penton was in the snack shop. (Tr. at 7)

3. Detective Garcia approached defendant Penton, identified himself and showed Penton his badge and police identification card. (Tr. at 7-8)  Detective Garcia was dressed in street clothes. (Tr. at 7)  Detective Garcia asked if he could talk to Penton and Penton said yes. (Tr. at 8)  Detective Garcia asked Penton to see his bus ticket and identification. (Tr. at 8)  Penton handed Detective Garcia a bus ticket that showed him traveling from Los Angeles, California, to Columbus, Ohio. (Tr. at 9)  The ticket was in the name of Petton. (Tr. at 9)  Detective Garcia testified that without him saying anything about the name discrepancy,[1] Penton stated that the Greyhound people had misspelled his name on the ticket. (Tr. at 9, 26)  Detective Garcia found this significant because couriers commonly use different names on their bus tickets. (Tr. at 10)  Detective Garcia handed the bus ticket and identification back to Penton. (Tr. at 10)  Detective Garcia then explained to Penton that he works with the Drug Enforcement Unit and that they talk to passengers making sure nobody is transporting anything illegal, such as narcotics and weapons. (Tr. at 10)

---

[1]Defendant Penton testified that Detective Garcia asked him about the discrepancy with his name. (Tr. at 55)

2

4. Detective Garcia testified that he asked defendant Penton if he could conduct a search of his backpack. (Tr. at 10, 17) Detective Garcia testified that Penton said yes and immediately walked over to a table that was directly in front of them and placed the backpack on the table. (Tr. at 10) Defendant Penton testified that Detective Garcia merely asked him to walk over to a table so that they would be out of the way of the food line and did not ask for permission to search the backpack. (Tr. at 55, 57-58) Defendant Penton testified that he took the backpack off because he was under the impression that they were going to take a seat at the table. (Tr. at 55) At this point, Penton realized that another person, Special Agent Dorley, was with Detective Garcia because Dorley followed them to the table. (Tr. at 56) Detective Garcia testified that he asked Penton if he could search his person to make sure he did not have weapons or narcotics. (Tr. at 17) Detective Garcia testified that Penton said yes and then raised his hands. (Tr. at 10, 17) Defendant Penton testified that Detective Garcia did not ask for permission to frisk him; instead Detective Garcia just told Penton that it was normal procedure and told Penton to put his hands in the air. (Tr. at 56, 69) Penton testified that he was not under the impression that he could have just walked away. (Tr. at 70) Detective Garcia conducted a physical search of Penton. (Tr. at 10, 17) After conducting the search of Penton's person, Detective Garcia looked in the backpack. (Tr. at 10) Special Agent Dorley testified that he heard Detective Garcia ask Penton, as he was going through the backpack, whether he could look in sections of the backpack and Penton saying that he could. (Tr. at 32, 42-43) Defendant Penton testified: "when Agent Garcia was at the table, me and him didn't have no other conversation." (Tr. at 57) Defendant Penton later testified: "When I noticed that he was going through it, I asked him like what did I do, what's the reason for this?" (Tr. at 58)

5. Detective Garcia found a large plastic pill bottle inside the backpack. (Tr. at 11, 18) The label stated that the bottle contained GNC brand chewable Vitamin C tablets. (Tr. at 11) Detective Garcia's attention was drawn to the bottle because he could tell that while the seal was still on it, it had been removed without breaking at some point. (Tr. at 11) Special Agent Dorley testified that Detective Garcia made a reference to defendant Penton about the seal of the bottle. (Tr. at 32) Special Agent Dorley further testified that Detective Garcia asked if he could open the bottle and Penton said yes. (Tr. at 32) Detective Garcia unscrewed the lid and removed it. (Tr. at 11, 18) Detective Garcia observed glue on the edges of the tamper-proof seal. (Tr. at 11) Detective Garcia testified that he found this to be inconsistent with what a store purchased bottle of pills would look like. (Tr. at 11) Detective Garcia removed the tamper-proof seal and observed an excessive amount of cotton that he had difficulty removing. (Tr. at 11, 18) Detective Garcia observed blue colored pills and white colored pills, which were not consistent with Vitamin C pills. (Tr. at 11, 19) Detective Garcia screwed the bottle shut and continued the search of the backpack. (Tr. at 12, 19) Detective Garcia did not observe anything else significant in the backpack. (Tr. at 12)

3

6. Detective Garcia testified that he did not threaten or coerce Penton to look in his backpack. (Tr. at 20) Detective Garcia testified that at no point in time did Penton tell him not to look through his backpack. (Tr. at 18) Special Agent Dorley testified that at no point did Penton withdraw his consent to the search of the backpack. (Tr. at 50)

7. Detective Garcia asked defendant Penton if he would follow him to the Customer Service area so that they could determine what type of pills were inside the pill bottle. (Tr. at 12, 19) While Special Agent Dorley testified that he heard Penton say that he would, Detective Garcia testified that Penton did not say anything, he just followed Detective Garcia to the Customer Service area which was approximately thirty feet away. (Tr. at 12, 19, 33) Detective Garcia had not told Penton that he was under arrest. (Tr. at 12) Special Agent Dorley followed Detective Garcia and Penton into the Customer Service area. (Tr. at 12) Detective Molly Mast was also in the Customer Service area. (Tr. at 12) The officers pulled the pills out and were able to identify the pills as oxycodone. (Tr. at 12-13, 34) Defendant Penton was then placed under arrest and transported to the back of the bus station where there is an office used to process arrests. (Tr. at 13)

8. Given the number of pills involved, it was determined that the case would be federal and Special Agent Dorley took over the investigation. (Tr. at 35) Defendant Penton testified that "before we engaged into a full investigation," he asked Special Agent Dorley a couple of times whether he needed a lawyer and Dorley told him that it would be in his best interest to be cooperative with him and to be forthcoming. (Tr. at 72) Special Agent Dorley advised Penton of his <u>Miranda</u> rights using a DEA Advice of Rights form. (Tr. at 13, 35-36; Government's Ex. 3) The Advice of Rights form provided (with Penton's initials and answers to questions in italics):

### YOUR RIGHTS

BEFORE WE ASK YOU ANY QUESTIONS, DO YOU UNDERSTAND:

<u>*DRP*</u>   You have the right to remain silent.

<u>*DRP*</u>   Anything you say can be used against you in court.

<u>*DRP*</u>   You have the right to talk to a lawyer for advice before we ask you any questions.

<u>*DRP*</u>   You have the right to have a lawyer with you during the questioning.

<u>*DRP*</u>   If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

4

Do you understand your rights?  *Yes*

Are you willing to answer some questions?  *Yes*

**WAIVER OF RIGHTS**

[ x ] I have read or [   ] someone has read to me this advice of rights and I understand what my rights are. I am willing to freely and voluntarily answer questions without a lawyer present.

(Government's Ex. 3; Tr. at 36) Penton agreed to waive his <u>Miranda</u> rights and signed the waiver. (Tr. at 13-14, 36; Government's Ex. 3)

9. Agent Durley interviewed Penton with Detective Garcia present. (Tr. at 13-14) After the interview, the officers counted the pills in the pill bottle. (Tr. at 14) 2,499 pills were recovered. (Tr. at 14)

10. Special Agent Dorley also asked defendant Penton's consent to look at his phone. (Tr. at 36) Penton signed a Consent to Search form for the phone. (Tr. at 36-37; Government's Ex. 4) Defendant Penton testified that Special Agent Dorley was looking at things on Penton's phone and caught Penton in a lie before Penton signed the consent form. (Tr. at 59-60, 74) The officers do not carry consent to search forms with them while walking around in the bus station. (Tr. at 25, 46)

11. There is a video of the initial encounter with defendant Penton in the Greyhound Bus terminal. (Tr. at 14-15; Government's Ex. 2) This video is from a surveillance camera which belongs to the bus station. (Tr. at 22) There is no law enforcement-initiated recording. (Tr. at 22)

III. <u>DISCUSSION</u>

Defendant Penton seeks to suppress all evidence and all testimony relating to such evidence obtained during a search of a backpack possessed by defendant. (Motion to Suppress Evidence (doc #33) at 1) Defendant argues that he was not asked for permission to search his bag and did not consent to the search. (<u>Id.</u> at 2)

The Supreme Court has described three categories of police-citizen encounters. The first is communication between police and citizens which involves no coercion or restraint of liberty and, therefore, is outside the scope of the Fourth Amendment. The second is a brief, minimally

5

intrusive seizure or investigative stop which must be supported by a reasonable suspicion of criminal activity. The third is a highly intrusive full-scale arrest which must be supported by probable cause. The minimally intrusive stop supported by reasonable suspicion and the full-scale arrest supported by probable cause involve Fourth Amendment considerations. See United States v. Cortez, 449 U.S. 411, 417 (1981); Reid v. Georgia, 448 U.S. 438, 440 (1980); Brown v. Texas, 443 U.S. 47, 50 (1979); United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975); Terry v. Ohio, 392 U.S. 1, 16-19 (1968); United States v. Campbell, 843 F.2d 1089, 1092-95 (8th Cir. 1988).

Law enforcement officers do not violate the Fourth Amendment by merely approaching an individual in a public place and asking him questions. See United States v. Jones, 990 F.2d 405, 408 (8th Cir.), cert. denied, 510 U.S. 934 (1993); United States v. Campbell, 843 F.2d 1089, 1092 (8th Cir. 1988). No objective justification is required for such an encounter because no constitutional interest is implicated. See United States v. Mendenhall, 446 U.S. 544, 554-55 (1980); United States v. Nunley, 873 F.2d 182, 184 (8th Cir. 1989); Campbell, 843 F.2d at 1092. Likewise, a search of an individual's baggage done with the individual's consent does not automatically escalate the consensual encounter into an investigative stop. See Florida v. Bostick, 501 U.S. 429, 435 (1991); United States v. Robinson, 984 F.2d 911, 914 (8th Cir. 1993). A court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter. See Bostick, 501 U.S. at 439; Robinson, 984 F.2d at 913. As long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual. Only when an officer, by means of physical force or show of authority, has in some way restrained the liberty of an individual should

6

a court conclude that a seizure has occurred. See Bostick, 501 U.S. at 434; Robinson, 984 F.2d at 913-14.

In Robinson, the Eighth Circuit affirmed the district court's ruling that the situation preceding Robinson's arrest was nothing more than a consensual encounter. The pertinent facts of the Robinson case were set forth as follows:

> On the morning of November 30, 1990, Robinson arrived at the Kansas City Amtrack station on the 7:15 a.m. train from Los Angeles. ... [Detective] Sola approached Robinson and asked if he could talk to him. Robinson agreed and Sola showed Robinson his badge and sat in the chair next to him. Sola told Robinson that he regularly talked to Amtrack passengers and again asked if Robinson had the time to talk to him. Robinson agreed. Sola then asked to see Robinson's ticket, which was a one-way ticket from Los Angeles to St. Louis in the name of John Jones. The connecting train was scheduled to depart at 9:15 a.m.
>
> When Sola asked Robinson for identification, Sola noticed that Robinson appeared very nervous and seemed to have difficulty swallowing. Robinson was unable to locate any identification and stated that his name was John Robinson and he lived in Lynwood, California. ... At this point Sola asked if he could search Robinson's luggage for narcotics, to which Robinson answered "No." Sola then told Robinson that he would order a narcotics-trained canine to sniff his luggage. Robinson said that he "did not want a dog" and told Sola to go ahead and look in the luggage. Sola told Robinson that he did not have to give permission to search the bags but Robinson said that Sola could search the bags.

984 F.2d at 912. Upon a search of Robinson's luggage, Sola discovered a box of cocaine and placed Robinson under arrest. Id. at 913. The Eighth Circuit concluded:

> During the questioning, the police detectives did not display their weapons or threaten to arrest Robinson. The police detectives did not use physical force or show of authority to detain Robinson in the terminal. Detective Sola began questioning Robinson around 7:30 a.m. and his train was not scheduled to depart until 9:15 a.m.; by his own actions, Robinson was detained in the terminal for over an hour and a half. Under the facts of this case, the district court was not clearly erroneous in finding that the continued questioning was a consensual encounter that did not constitute a Terry stop.

Id. at 914.

In the present case, the contact between Detective Garcia and defendant Penton was

7

consensual. Detective Garcia approached Penton in a public place, identified himself as a police officer and asked if he could speak with Penton. (See Fact No. 3, supra) Penton said yes. (Id.) Detective Garcia asked Penton if he could see his bus ticket and identification. (Id.) Penton provided the ticket and identification to the detective. (Id.) Detective Garcia asked if he could search Penton's backpack. (See Fact No. 4, supra) Penton said yes, walked to a table and placed the backpack on the table.[2] (Id.) Up until this time, Detective Garcia was the only officer who had any contact with Penton. (Id.) During his conversation with Penton, Detective Garcia had not threatened or coerced Penton to look in his backpack. (See Fact No. 6, supra) Detective Garcia had not told Penton that he was under arrest. (See Fact No. 7, supra) At no point in time did Penton tell Detective Garcia not to look through his backpack. (See Fact No. 6, supra)

The Court finds that a reasonable person would have felt free to decline Detective Garcia's requests and terminate the encounter. Under Robinson, the facts of this case warrant a conclusion that the questioning of defendant and the search of his backpack constitute a consensual encounter that did not constitute a Terry stop. Prior to discovering the pills in defendant Penton's backpack, Detective Garcia neither detained nor interrogated Penton.

A search that is conducted pursuant to a valid consent does not violate the Constitution. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Ramey, 711 F.2d 104, 107 (8th Cir. 1983); United States v. Matthews, 603 F.2d 48, 51 (8th Cir. 1979), cert. denied, 444 U.S. 1019 (1980). The test in reviewing a consent search is whether, in the totality of the circumstances, the consent was given voluntarily and without coercion. See United States v.

---

[2]The Court acknowledges that this finding is inconsistent with the testimony of defendant Penton. However, based upon the Court's review of the video of the encounter at the snack shop and the testimony of Detective Garcia and Special Agent Dorley which conflicts with that of defendant Penton, the Court finds that Detective Garcia requested and was given defendant's consent to search the backpack.

8

Palacios-Suarez, 149 F.3d 770, 772 (8th Cir. 1998); United States v. Turpin, 707 F.2d 332, 334 (8th Cir. 1983); United States v. Dennis, 625 F.2d 782, 793 (8th Cir. 1980). In United States v. Sanchez, 156 F.3d 875 (8th Cir. 1998), the Eighth Circuit Court of Appeals set forth the following with respect to the relevant circumstances:

> Whether consent is voluntary depends upon the "totality of the circumstances." When evaluating such circumstances, we pay particular attention to the characteristics of the person giving consent and to the encounter from which the consent arose. Relevant characteristics of the consenting party include age, intelligence and education; chemical intoxication (if any); whether the individual was informed of the right to withhold consent; and whether the suspect generally understood the rights enjoyed by those under criminal investigation. To assess the environment surrounding the consent, we consider the length of time that the suspect was detained and questioned; whether the police intimidated the suspect; whether the suspect relied upon promises or misrepresentations made by the police; whether the suspect was in custody when the consent was given; whether the encounter occurred in a public or secluded place; and whether or not the suspect objected to the search.

Id. at 878 (citations omitted). The government bears the burden of proving that consent was voluntarily given. See United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006), cert. denied, 549 U.S. 1292 (2007).

Based on the evidence presented at the hearing, the Court finds that only slightly over one minute elapsed from the time Detective Garcia initially approached defendant Penton to the time when Detective Garcia asked Penton if he could search his backpack, Penton said yes, and then walked to a table and placed the backpack on the table.[3] (See Fact No. 4, supra; Government's Ex. 2 at 10:15:44 to 10:16:53) Up until this time, Detective Garcia was the only officer who had any contact with Penton. (Id.) During his conversation with Penton, Detective Garcia had not

---

[3] As set forth above, the Court acknowledges that this finding is inconsistent with the testimony of defendant Penton. However, based upon the Court's review of the video of the encounter at the snack shop and the testimony of Detective Garcia and Special Agent Dorley which conflicts with that of defendant Penton, the Court finds that Detective Garcia requested and was given defendant's consent to search the backpack.

9

threatened or coerced Penton to look in his backpack. (See Fact No. 6, supra) Detective Garcia had not told Penton that he was under arrest. (See Fact No. 7, supra) They were in a public area with other people around. (See Government's Ex. 2) Penton was 35 years old and familiar with the legal system as evidenced by his criminal history. (See Pretrial Services Report (doc #7)) At no point in time did Penton tell Detective Garcia not to look through his backpack. (See Fact No. 6, supra) While Detective Garcia did not advise defendant that he did not have to consent to a search, Garcia was under no obligation to do so. See United States v. Palacios-Suarez, 149 F.3d 770, 773 (8th Cir. 1998).

The Government met its burden in establishing that defendant Penton's consent to search was freely and voluntarily given and not the result of duress or coercion.

### IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Penton's Motion to Suppress Evidence (doc #33).

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                                  */s/ Sarah W. Hays*
                                                  SARAH W. HAYS
                                    UNITED STATES MAGISTRATE JUDGE